Case number 131950 United States v. Beatrice Munyenyezi Good morning your honors, Mark Howard for the appellant Beatrice Munyenyezi. Beatrice Munyenyezi deserves a new trial in this case. A new trial that is free from the admission of irrelevant and prejudicial evidence about her stemming from her testimony before the after the false statements that were the subject of the indictment in this case. Those statements were inadmissible under 404B and Judge McAuliffe admitted them. Second, she deserves a new trial that is free from the prosecutorial misconduct that occurred when they blatantly suggested that Beatrice's brother-in-law was the head of the Rwandan secret police during the 1994 genocide. Although they had a good faith basis for that question because that evidence had been generated in an unrelated case in Boston, there was no evidence in Beatrice's case. The witness denied any knowledge of it, but the prosecutor expressing incredulity suggested to the jury more than strongly in the words of Judge McAuliffe that the facts were true and those facts never made it into her trial. Those the combination of those two evidentiary matters worked together to reverse what I see as a grave injustice in this situation. It's difficult in just a matter of a few minutes to recount the Rwandan genocide and its effect on this case. I think it's sufficient to say Beatrice grew up in Rwanda. She's a native Rwandan. She was married to a person named Shalom Nadabali whose father was the university rector in Butari, Rwanda. His mother was the Minister of Women's Affairs for the then ruling MRND government. She emigrated from or rather was a refugee from Rwanda at the end of the genocide, made it through Kenya and into the United States through a series of refugee applications, ultimately her resident permanent legal status, and then her citizenship. She was that process she had made several lies, false misrepresentations about her involvement in the genocide and her membership in the MRND government. There was a first trial in this case in February of 2012 that resulted in a hung jury. The prosecution's theory in that case using an entirely different cast of witnesses was that she was a murderer, impelled others to commit rape, kidnapping, and other horrific crimes. Again, that resulted in a hung jury. In order to, they affected an enormous sea change for the second trial, went to Rwanda and in a matter of three weeks, what had previously taken them years, in a matter of three weeks came up with a whole new cast of witnesses to talk about the rather benign facts that maybe she wore MRND garb and must have been a member of the party. Maybe she was present at roadblocks. Not a particularly compelling case. The whole stories of murders and rapes and kidnappings never occurred in the second trial. However, when we put on our defense witnesses, we created the true scenario for the jury that Beatrice and her family members had sought refuge in the family hotel in Butari, the Iharuro, and one of the witnesses that we brought here was the cook Alice Ahisakaya. Alice was a peasant, illiterate member of the staff for the family. She was the only witness who was at the hotel throughout the entire period of the genocide, and that garnered the prosecution's strict attention. They went after her hammer and tongs, and that is where the evidence of the secret police came out. They went at her with the question, isn't it true that Beatrice's brother-in-law, Athanase, was the head of the Rwandan secret police, and Alice said, I have no knowledge of that. That caused the prosecutor to act with extreme incredulity, and you can tell by Judge McAuliffe's comments that the district court judge was extremely bothered by what the prosecutor was attempting to do, admonished him not to do it again, and he did it with another witness, knowing that he would have no evidence that Athanase was the head of the secret police. The district court also took action at the time to offset any harm that might have resulted, and gave curative instructions and did other things. This is helpful, Mr. Howard, but you have to convince us that the district court committed an error in light of all of that, and the good faith of the government has not been questioned. It was expressly at trial agreed that the government had not acted in bad faith, and that makes a bit of a difference here as well. Well, there's two different points there. Yes, but I'm trying to get you to our standard of review. Right, and the manifest error in not granting a new trial rests exactly here. The prosecutor knew exactly what he was doing when he said secret police. He knew how that was going to poison the minds of those jurors. When you hear that phrase secret police, the only thing you think of is the SS. You think of jack-booted thugs, who are out there killing people. You can't unpoison that well, and the prosecutor knew that. Was there a good faith basis to ask the question? Sure, because all that requires is some fact that you know that you have proved before. I can try to ask the question. Where the problem comes in is that he repeats it with, you didn't know that? Your own brother-in-law? Where the curative instructions don't work is that you can't unpoison that well. It's one thing to say, hey, a small mistake was made here. It's another thing to say, this witnesses credibility, and it's the same witness that the prosecutor then said, and Alice, you were at that Boston trial. You were brought as a witness for Beatrice's sister in her case, weren't you? You were prepared to go sled length for these sisters. And Alice said, no, I wasn't there. The prosecutor was the prosecutor in that case. He knew Alice wasn't there. The agents who brought all the witnesses for the Boston case were in the courtroom. They knew Alice wasn't there. Was this an argument that we should find the government did act in bad faith? It's not a bad faith issue with respect to the basis to ask the question. It's bad faith in bolstering their own case, their attack on her credibility with facts that they knew weren't true and did it intentionally. And then if we agreed with that, why is this not harmless in any event? Because the evidence of her guilt was not overwhelming. It was incredibly benign, very questionable evidence. To begin with, we had testimony from people who were 13, 14 years old. The district judge in sentencing certainly didn't agree with that characterization. I'd be interested in your arguments on the sentence. The district court judge at sentencing, without being unnecessarily critical of Judge McAuliffe, he lived this case as well as we did. He did hear both trials. And it was clear to me that Beatrice was being sentenced for what was said in the first trial, not the second trial. He bought fully that she participated in murders, directed rapes, directed kidnappings, and that's the basis for the sentencing. I understand on a preponderance of the evidence that he can probably do that, but there isn't much doubt in my mind that the effect of the first trial drove the sentence after the conviction was on extremely benign evidence. I'm curious that you can see that. It seems to me that even if the government knew that at some prior trial this evidence about the brother-in-law had come out, that if it didn't intend to present any witnesses at this trial, and if it didn't have any good faith reason to think that this witness would answer that question in the affirmative, that I'm not sure why you concede good faith. I concede that it was a good faith basis to ask the question, because as I understand that doctrine, you don't have to have admissible evidence separately to prove the point just to ask the question. Where bad faith comes in is he asks the question, the witness denies it, there's no other evidence of it, and then the prosecutor steps forward and says, what? You didn't know that he was the head of the secret police in Rwanda? That's the prosecutor testifying. So if there had been no curative instruction, I could see where that falls. Is there a case that suggests that even when there is a curative instruction, that kind of expression of incongruity requires reversal of the whole conviction? I'm not aware of such a case, Your Honor. I have to rely on the very unique circumstances of this prosecution and odyssey, to say the least, from the summer of 2010 to today. And I'm asking that the court look at that through that kind of prism and treat this case differently, in that we are talking about transporting an entirely different culture of witnesses into an American courtroom and trying to prove a case under American rules that just didn't work here. On the sentencing challenge, could you just work through, I guess one argument is that the, well, what is the argument as to what's wrong with the sentence? You just said on a preponderance, there's probably enough there to support the conclusion that she participated in genocide, which would mean, I guess if that's right, then the fact that there's a conviction for her lying about her participation in genocide would provide some basis for what the district court judge did, which is, well, that's about as bad a lie as you could tell for getting into the country, so what's wrong with that reasoning? I think those are two different paradigms. You're talking about, one, what is the proof at trial beyond a reasonable doubt that she lied about these various things, and the only thing she was convicted on, again, was her supposed membership in a political party and maybe presence at roadblocks. That's about it. What Judge McAuliffe was doing was saying, I listened to a whole different story a year and a half ago, and I believe that story. Well, putting just in this trial, what basis would there have been for Judge McAuliffe's determination that the evidence in this trial by a preponderance would have supported participation in genocide as opposed to having lied about being at the roadblocks? I think that the only one witness who came even close, and I can't frankly remember his name, but he was a 13-year-old boy who said that she directed a group of women to set off to the side of the road, and soldiers took them off into the woods. That's it. And do you have an argument about why that's not enough? To go from a zero to six-month sentence to 10 years, I think that's an extraordinary climb uphill for somebody who doesn't even say that she actually participated. She was just there and was one of the people who was involved in segregating people going through the roadblock. Does that mean that she's a murderer and a rapist and a kidnapper? No, I don't think it means that at all. Does it justify an exponential increase in a sentence? No. It wasn't their testimony. They go off into the woods, gunshots are heard, and bodies are found. Not those bodies, but that story is told, yes. By the same boy? Whether it's apocryphal or not, the story is told. Is that by the same boy, or is that a different story? It's not the same boy. It's some soldier, a guy named Bruno in the record. All right. Thank you very much. Judge Blanchard, may it please the Court. Mark Quinlivan on behalf of the United States. Let me turn first to the due process claim. Because I want to begin with the fact that my friend's suggestion of what occurred at trial simply is inaccurate. And I direct the Court's attention to pages 1669 to 1670 of the appendix. The prosecutor was asking the witness whether she recalled being interviewed by American agents in Rwanda. She said she did not. He asked if it would be helpful if she saw Special Agent Anderson, the case agent, and asked him to stand up. The witness responded, I think it's the first time I've seen that man. He then asked, isn't it true that you were, in fact, interviewed in Rwanda? And she said, yes, now I do remember. And the follow-up question was, and he showed you a picture of Mr. Munyan Mana, and you identified him. She answered yes. Then the prosecutor asked the question, and he was the director of the secret police in Rwanda. Defense counsel raised an objection at that point before the witness had answered the question, and there was a sidebar. There wasn't, the witness did not testify that she did not recall, as has been suggested, nor did the government express any incredulity, as has been suggested. And again, that's pages 1669 to 1670 of the appendix. That's what occurred in this case. Now, I want to point that Judge McAuliffe, I think, made two key findings that compelled the conclusion that there was no due process violation. The first was the finding that the government had a good faith basis for asking the question. And I note that when this issue was raised, the government, in its proffer, argued not only did it have a good faith basis that Mr. Munyan Mana, in fact, was the head of that section of the service, based on the testimony from his contiguous trial, but that he had a good faith basis to believe that the witness would answer yes, because she had been interviewed by the agent in Rwanda. And indeed, as the passage I just suggested, she had changed her testimony on a dime with respect to whether she recalled being interviewed by the agent. So I would suggest that when Judge McAuliffe found and repeatedly found that the government had a good faith basis for asking that question, it encompasses both of those conclusions. And moreover, the test for a mistrial basically asked whether the evidence so poisoned the well that there's no hope of repair. And again, I point to Judge McAuliffe not instructing the jury at the outset of the trial that facts assumed in questions are not evidence. The judge repeated that instruction on several occasions during the trial, giving curative instructions and illustrative examples. And it repeated that instruction in its final charge. And when the court denied the motion for a mistrial, he said, if there's one thing, after reading the jury and watching their reactions to my questions, if there's one thing I think they understand very, very clearly, it's that facts assumed in questions are not evidence. Quote, I am absolutely convinced that they understand that completely. So based on that finding, the suggestion that the evidence in this case, which was, again, simply a question with no answer given, so poisoned the well that it was beyond hope of repair, I would suggest that that simply can't be sustained. And Judge McAuliffe did offer to give yet another curative instruction if the defendant felt that one needed to be given and the defendant declined that opportunity. So I don't think she should now be heard to say that this evidence, once again, so poisoned the well that it was beyond evidence of repair. If I could answer Judge Barron's question about the sentencing, the evidence there were four eyewitnesses who testified that they personally, that they saw the defendant manning the roadblock at the Hotel Iheriro, personally asking for identity cards and separating Tootsies from Hooties. And one of those witnesses, who was, I think, 13 or 14 at the time, Vincent Sibamana was his name, testified that he, because of his age, he didn't have an identity card. And the defendant told him to go to the side of the road where a soldier hit him in the head with a rifle butt, and then he heard the defendant say, take him to be killed. So the suggestion that the evidence in this case somehow was benign or that it was simply her mere presence at the roadblock, the record in this case belies that completely.  It was all testimony of people from different walks of life who either saw the roadblock from where they were hiding in nearby places or actually went through the roadblock themselves. In addition, there was testimony from a Rwandan Army officer who went through the roadblock, and he saw a woman manning the roadblock, who he didn't know, but one of the soldiers he was with identified the woman as Beatrice. So once again, this wasn't evidence that was benign. And at sentencing, Judge McAuliffe said that he actually came to this case with a high degree of skepticism, because he didn't want to believe that anyone, let alone the defendant in this case, could have committed the crimes that she was charged with lying about in this case. But he said that he could not discount the evidence that had been presented at trial, which under, in his view, under the preponderance standard, showed conclusively that she had been an active participant in the roadblock, that she had personally checked identity cards, that she had separated Tootsies from Hutus, and that she was complicit, if not aiding and abetting, in the murder of Tootsies. And the judge said that lying about those facts to gain citizenship into the United States are by definition the type of crimes which Congress would have envisioned the statutory maximum to apply. Is there any guidance in the commentary or anything about what kind of lie figures the maximum? Judge Barron, I'm not aware of any. I certainly can go back, but I'm not aware of any legislative history that answers that question one way or another. But at bottom, to the extent this is a claim of substantive unreasonableness, this court demands that there be a plausible sentencing rationale and sufficient explanation. And admittedly, when there is such a large deviation from the advisory guidelines to the sentence given, more in terms of an explanation for a sentence, for a chosen sentence is demanded. I would suggest that Judge McAuliffe here more than satisfied that obligation in explaining the chosen sentence in this case. Thank you.